IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WALTER O'RILEY POINDEXTER | * | |
| | * | |
| Petitioner, | * | CIVIL  NO. WDQ-05-829 |
| | * | CRIMINAL NO. WDQ-03-213 |
| v. | * | |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent. | * | |

\* \* \* \* \* \* \*

## GOVERNMENT'S POST-HEARING BRIEF

The United States of America, by its undersigned counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Harry M. Gruber, Assistant United States Attorney for said District, respectfully submits the following post-hearing brief in opposition to petitioner's motion to vacate pursuant to 28 U.S.C. § 2255.

## BACKGROUND

On May 1, 2003, a federal grand jury returned an Indictment against Defendants Walter Poindexter and Deon Smith.  The Indictment charged Poindexter with conspiring to distribute and possess with intent to distribute over one kilogram of heroin, in violation of 21 U.S.C. § 846, and three counts of distributing heroin, in violation of 21 U.S.C. § 841.  The grand jury later returned a Superseding Indictment, adding additional charges against Deon Smith.  The case proceeded to a jury trial before this Court on December 1, 2003.  Messrs. Arcangelo Tuminelli and Kenneth Ravenell represented Poindexter and Smith, respectively.

On December 4, 2003, after three days of trial, Poindexter pled guilty pursuant to a written plea agreement, to three counts of distributing heroin.  In the written plea agreement and

1

during the rearraignment, Poindexter admitted that he sold heroin to an FBI cooperating witness on three separate occasions. See Ex. 5. As part of Poindexter's guilty plea, the government agreed to dismiss the drug conspiracy charge involving at least one kilogram of heroin – a drug amount substantially higher than the 40-60 grams of heroin attributable to his offenses under the plea agreement. Additionally, as part of the guilty plea, the Baltimore City State's Attorney Office agreed not to prosecute Poindexter for "any conduct that formed the basis of th[e] federal prosecution," including Poindexter's alleged use of a firearm to commit murder on January 22, 2001, and the federal government agreed not to seek any sentencing enhancement based on this conduct. See id.

In his plea agreement, Poindexter further agreed to a variety of other provisions, including an appeal waiver and certain understandings about his guideline calculation, including the fact that he might be sentenced as a career offender.[1] See id.   On December 4, 2003, this Court conducted a Rule 11 proceeding. During the hearing, the Court and the government advised Poindexter about the significant provisions of the plea agreement, including the appellate waiver and his possible designation as a career offender.

The presentence report revealed that Poindexter was a career offender, based on Poindexter's prior convictions for Assault with Intent to Maim (involving the use of a firearm on a police officer),

---

[1] The plea agreement provided that there was "no agreement" as to Poindexter's criminal history or criminal history category, but that "if [Poindexter] is a career offender, the base offense level is adjusted to 32 pursuant to U.S.S.G. § 4B1.1(c)." Ex. 5 at para. 6(b). The appeal waiver provision read as follows: "[Poindexter] . . . knowingly and expressly waive[s] all rights conferred by 18 U.S.C. Section 3742 to appeal whatever sentence is imposed, including any issues that related to the establishment of the guideline range, reserving only the right to appeal from an upward . . . departure from the guideline range that is established at sentencing." Ex. 5 at para. 8.

and Possession with Intent to Distribute Cocaine.[2]  See Ex. 6.  On March 12, 2004, the case proceeded to sentencing before this Court.  During the hearing, this Court found that Poindexter was a Career Offender with a final offense level of 30 and a criminal history category of VI.  The Court also granted the government's motion for a one-level downward adjustment pursuant to U.S.S.G. Section 5K1.1.[3]  This Court sentenced the Defendant to 168 months imprisonment, which was within the applicable guideline range.

On March 28, 2005, Poindexter filed a motion to vacate his conviction pursuant to 28 U.S.C. § 2255, advancing a plethora of arguments.  Among his various arguments, Poindexter claimed that he was denied the effective assistance of counsel when he asked Mr. Tuminelli to file an appeal and he failed to do so, and when Mr. Tuminelli failed to object to the filing of a Section 851 Information, adequately advise Poindexter about the guilty plea, and object at sentencing to Poindexter's career offender status.  Poindexter also argued that his conviction should be vacated due to alleged prosecutorial misconduct by Assistant United States Attorney Jonathan Luna and insufficiency of the evidence.

This Court denied Poindexter's petition, finding no merit in any of Poindexter's claims.  The Fourth Circuit then granted a certificate of appealability, focused solely on Poindexter's purported request that Mr. Tuminelli file an appeal on his behalf.  The Fourth Circuit then issued a decision

---

[2]  Poindexter also incurred additional criminal history points due to his two prior convictions for possession of controlled dangerous substances and his decision to commit the present offense while still subject to a state sentence for the prior drug distribution offense. Nevertheless, because of his status as a Career Offender, these enhancements resulted in no actual increase in Poindexter's sentence.

[3]  Poindexter agreed to be interviewed by the government in connection with the death of Assistant United States Attorney Jonathan Luna.

of first impression in this Circuit, extending the Supreme Court's decision in Roe v. Flores-Ortega, 528 U.S. 470 (2000), and holding that if a trial counsel fails to file an appeal after being asked to do so by a client, that failure amounts to *per se* ineffective assistance of counsel – regardless of whether the defendant waived his right to file the underlying appeal that the attorney failed to file.  See United States v. Poindexter, 492 F.3d 263, 272 (4th Cir. 2007).  The Fourth Circuit remanded Poindexter's case to this Court and instructed this Court to conduct an evidentiary hearing to determine if Poindexter actually asked his attorney to appeal and the attorney failed to do so.

On June 5, 2008, this Court held an evidentiary hearing concerning Poindexter's purported request to appeal.  The defense called two witnesses: Poindexter and Theresa Rhyne.  The government called Mr. Tuminelli.

**ARGUMENT**

I.   **Arcangelo M. Tuminelli Was Not Constitutionally Ineffective.**

   A.   **Poindexter's Petition Should Be Denied Because He Did Not Request That Mr. Tuminelli File An Appeal.**

The parties appear to be in agreement that the crucial issue before this Court in these post-conviction proceedings is whether Poindexter asked his attorney, Mr. Arcangelo Tuminelli, to file an appeal in March 2004 of his conviction and sentence for distributing heroin on three different occasions in September 2002.  If this Court makes a factual finding that Poindexter asked Mr. Tuminelli to appeal before the time for filing such an appeal lapsed, the Fourth Circuit's recent decision requires this Court to vacate the Defendant's conviction.   The evidence at the evidentiary hearing, however, demonstrated that Poindexter did not ask his attorney to appeal, and thus Poindexter's petition should be dismissed.  The government asks this Court to make a factual finding

that no timely request to file an appeal was made by Poindexter to Mr. Tuminelli. In support of this finding, the government argues that this Court should credit the testimony of Arcangelo Tuminelli, one of the most respected members of this Court's bar, and reject the testimony of Poindexter and Ms. Rhyne.

### 1. This Court Should Credit The Testimony Of Respected Attorney Arcangelo Tuminelli.

Mr. Tuminelli testified at the evidentiary hearing that Poindexter never asked him to file an appeal. Mr. Tuminelli testified in a very credible manner, his statements made sense and were supported by the documents and other relevant evidence, and he obviously recalled this case well. As Mr. Tuminelli explained to this Court, the case was unusual because (1) he achieved what he considered to be a phenomenal result for his client and (2) his opposing counsel, Assistant United States Attorney Luna, died during the course of the proceedings. As Mr. Tuminelli stated at the conclusion of his testimony at the evidentiary hearing, this case "sticks out more than most, and [is] probably one of the five that I remember the most about" in 29 years of practicing law. Tr. at 97.

Mr. Tuminelli's testimony at the evidentiary hearing plainly established that he was never asked to appeal by Poindexter, Poindexter's mother, or Theresa Rhyne. At the hearing, Mr. Tuminelli testified as follows on this crucial point:

> I firmly am convinced that neither he, nor his mother – and I learned today I guess its Sergeant Rhyne, that none of them to my knowledge and belief, ever raised the possibility of filing an appeal for Walter. Again, if I had heard that, I would have been shocked by it, and I would have talked to Walter . . . .

Tr. at 81. On another occasion during the evidentiary hearing, Mr. Tuminelli was asked to clarify this point. He was asked, "And, again, your testimony is that neither Mr. Poindexter, his mother, nor the corrections officer asked you to file an appeal on his behalf?" Tr. at 84. Mr. Tuminelli

5

answered without hesitation, "That is correct." Id.

Mr. Tuminelli's testimony about the alleged request to file an appeal makes sense because such a request would have been very surprising to him in light of the entire context of his discussions with Poindexter and the favorable nature of the plea agreement Mr. Tuminelli and Poindexter reached with the government. Mr. Tuminelli testified at the evidentiary hearing that he was retained by Poindexter in connection with this case and that the representation last approximately 6-9 months. Tr. at 69. Mr. Tuminelli stated that during the course of the representation, he and Poindexter had numerous conversations about the potential duration of Poindexter's incarceration and their interest in resolving the case through a plea deal with the government. Tr. at 70. Negotiating a resolution to the case, however, was impossible as long as the government intended to seek an enhancement at sentencing based on Poindexter's alleged involvement in the 2001 murder. See id. Mr. Tuminelli testified that the government had alerted him that it had grand jury testimony from Poindexter's girlfriend that implicated him in the murder. See id. at 70-71.

Mr. Tuminelli advised that the government's position changed after the defense attorneys obtained an order by this Court releasing damaging information found in the pretrial services file of a cooperating witness, Warren Grace. Tr. 71. Mr. Tuminelli's aptly characterized "what had occurred with the Government's witness, Warren Grace" as "a Godsend to Walter Poindexter, because . . . up until that point . . . the probabilities were that he was going to get a life sentence." Tr. at 76. Moreover, this was not just Mr. Tuminelli's understanding, but also Poindexter's understanding: "He understood that [a life sentence] was a likelihood, and, in terms of that plea, both of us understood that he was extremely fortunate . . . ." Id. Mr. Tuminelli noted that the government's plea offer allowed Poindexter to avoid a federal enhancement for the murder as well

6

as a possible state murder trial, not to mention the longer sentence he would have been subject to if convicted of the larger narcotics conspiracy allegations. Tr. at 76-80.

Accordingly, Mr. Tuminelli explained that he would have been very surprised by any request to file an appeal and would certainly remember it. If Poindexter had asked Mr. Tuminelli to appeal, Mr. Tuminelli

> would have thought he was insane, and simply because I thought that he had dodged a bullet . . . it would have been absolutely, in my mind, foolish for him to even consider that, and if he had asked me for an appeal . . . ***I certainly would have remembered, you know, him raising that kind of issue, because I would have been shocked by it***

Tr. at 77.

Moreover, Mr. Tuminelli's testimony should be credited by this Court because it is consistent with the documents and other evidence before this Court. For example, Mr. Tuminelli testified that in approximately August 2004, he communicated with Poindexter and his mother about the impact of the Supreme Court's decisions in <u>Booker</u> and <u>Blakely</u>. <u>See</u> Ex. 1, Tr. at 84. Mr. Tuminelli testified that he did not recall any discussion of an appeal until he received Poindexter's letter in February 2005. <u>See</u> <u>id</u>.; <u>see also</u> Ex. 2. And Mr. Tuminelli aptly explained at the evidentiary hearing his reaction to the February 2005 letter:

> I was angered by it. I understand that Walter got 14 years, and I understand that no one wants to spend 14 years or, with diminutions, somewhat less than that in the prison, but I thought he had been treated fairly by everyone, and I was angered because it suggested that I had ignored his interests, that he had somehow been misled, and he had been taken advantage of, and I know that that's not how I treated Walter, and I sort of felt that Walter was ready to throw me under the bus because he wanted some kind of relief, and ***he didn't care what the truth was***.

Tr. at 82 (emphasis added). Mr. Tuminelli's testimony is supported by a review of Government

Exhibits 1, 2, & 3, which plainly confirm Mr. Tuminelli's recollections. Exhibit 1 contains a letter responding to Poindexter's mother and memorializing Mr. Tuminelli's discussions with Poindexter about Blakely and Booker – yet there is no reference to appeal. See Ex. 1; see also Ex. 8. Moreover, Exhibits 2 and 3 show that almost immediately after he received Poindexter's February 14, 2005 letter, Mr. Tuminelli wrote a very direct and straightforward response, dated February 16, 2005, which read, inter alia:

> I was unpleasantly surprised by your letter dated February 14, 2005. I have several comments.
> First, I never misled you, deliberately or otherwise. Second, I never assured you that you would get a six year sentence. Third, **neither you nor your mother made repeated requests that I file an appeal for you**. . . . My recollection is that you and I discussed an appeal, but since you waived an appeal except from an upward departure at sentencing, you understood that there were no viable appeal issues . . . .
> Sixth, and most importantly, . . . [y]ou have conveniently forgotten that you wanted a plea agreement, but the government wanted to argue that your sentence should be life because of the murder they said you committed. . . . The day before you pled guilty, the government finally agreed not to raise the murder at your sentencing to enhance your sentence.

Ex. 3.

Finally, Mr. Tuminelli, unlike Poindexter, does not have a motive to hide the truth from this Court. To do so would risk his entire professional reputation of 29 years. Instead, it is noteworthy what he told this Court at the conclusion of his testimony when this Court inquired what Mr. Tuminelli would have done if he had been asked to appeal. Mr. Tuminelli stated that if Poindexter had ever asked him to file an appeal, even if Mr. Tuminelli thought the appeal was a terrible idea, he still would have filed the appeal. Tr. at 95-96. And if Poindexter had ever voiced any thoughts (even ambiguous ones) to Mr. Tuminelli prior to February 2005 about an appeal, Mr. Tuminelli made plain that "[he] would have been shocked by it, and [he] would have talked to Walter." Tr.

8

at 81. Later, Mr. Tuminelli made plain that even if he had been asked to file the appeal and had neglected his duty to do so, he would have alerted the Court. Under no circumstances, would Mr. Tuminelli "have simply ignored such a request and then ignored that [he] had neglected to do it." Tr. at 97.

### 2. This Court Should Reject Poindexter's Self-Serving Testimony That He Asked His Attorney To File An Appeal.

In contrast to Mr. Tuminelli's testimony, Poindexter's testimony and statements on this issue cannot be trusted. A few areas of discussion amply demonstrate these points.

First, and perhaps most significantly, it is difficult to comprehend and believe Poindexter's own version of events since it conflicts in such a basic way with common sense. Poindexter alleged that on three separate occasions he asked Mr. Tuminelli to file an appeal and yet Poindexter cannot recall anything concerning Mr. Tuminelli's response aside from the following alleged statement in the courtroom to Poindexter: "Shush, be quiet." Tr. at 42-43.

Moreover, according to Poindexter's version of events, he never heard anything further about his requested appeal from Mr. Tuminelli. Yet, it took Poindexter eleven months – until February 14, 2005 – to write a letter to Mr. Tuminelli concerning Poindexter's alleged request for Mr. Tuminelli to file an appeal. Tr. at 49, Ex. 2. Equally disturbing, Poindexter never wrote to this Court to complain about Mr. Tuminelli's alleged failure to file the requested appeal until approximately February 2005. See Ex. 7. And during this time, Poindexter was sitting in jail with nothing to do but think about his own case. Tr. at 50.

Poindexter testified at the hearing that he understood that it was important to put things in writing and to file documents with this Court to protect his interests. Tr. at 51. And, yet, under his

9

own version of events, he sat idle for almost an entire year, until he brought these issues up again right before the deadline for filing a petition under Section 2255. This timeline is especially disturbing because according to Poindexter's own version of events, he admits that he talked with Mr. Tuminelli in August 2004 concerning the effect of the <u>Blakely</u> and <u>Booker</u> decisions on his sentence. <u>See</u> Tr. at 54, Ex. 1. But Poindexter admitted he didn't raise the issue of the appeal with Mr. Tuminelli at that time. Tr. at 54-55. In fact, he admitted in his testimony at the evidentiary hearing that when he spoke with Mr. Tuminelli in the Summer of 2004, he was aware an appeal had not been filed on his behalf. Tr. at 56 (Question: you knew throughout the summer of 2004 that an appeal had not been filed? Answer: "Correct"). Yet, Poindexter waited until he was preparing his petition in the Spring of 2005 to raise the appeal issue by sending letters to this Court and Mr. Tuminelli.

Equally unbelievable is Poindexter's testimony as to his alleged reaction after receiving that Mr. Tuminelli's February 2005 letter. <u>See</u> Tr. at 59. According to Poindexter, upon receiving Mr. Tuminelli's letter dated February 16, 2005, which denied that Poindexter ever asked him to appeal, Poindexter's only reaction was that he "had a different view of, you know, I guess, you know, his – the things that he says now." Tr. 59-60, Ex. 3.

The conflicts between Poindexter's own testimony and common sense become even more stark when one considers that Poindexter has every reason in the world to lie. He has testified that he is very upset with the amount of time that he must now serve in jail and hopes through his petition to obtain a reduction in his sentence. As this Court is well aware, someone in Poindexter's position could easily be inclined to lie (with little or no downside risk) in hopes of receiving a possible reduction in his sentence.

Second, Poindexter's testimony at the hearing differed in substantial respects from his own Section 2255 Petition.  Poindexter's own submissions to this Court asserted that Poindexter "was duped into accepting an ambiguous plea offer which promised a maximum sentence of 48-months." Ex. 4.  Poindexter further claimed in his petition that he was "placed in a position of having to make a "Hobson's Choice" due to the hurried fashion in which the plea offer was presented – standing handcuffed beside his mother at the rail of the courtroom on the third day of his jury trial – as the court was about to reconvene after the noon recess.[4]  Ex. 4.

In contrast to these statements, Poindexter admitted at the evidentiary hearing that he and his attorney had long discussed a possible plea that didn't include a murder enhancement. Tr. at 30.  On several occasions they talked about it and discussed how he would plead guilty if that type of offer became available.  Id.  He further admitted that the plea offer he eventually accepted was extended to him on the third day of trial by Mr. Luna and that he had until the next day to consider the offer before he actually proceeded with the guilty plea. Tr. at 30-31.  He further acknowledged that Mr. Tuminelli may have had to assure him that the government would still extend the plea offer despite Mr. Luna being unavailable on the day Poindexter actually wanted to plead guilty. Tr. 31-34, 45.  In fact, at the evidentiary hearing, Poindexter retracted all of his complaints in his Section 2255 petition about the manner in which the plea was presented to him.  Disavowing his prior statements in his petition and letter to Mr. Tuminelli, Poindexter denied having ever had concerns about having pled guilty, stating: "but never was I upset about me having to enter into a guilty plea." Tr. at 34.  He stated that his only current complaint is whether he should have been sentenced as a career

---

[4] Similarly in his letter of Mr. Tuminelli dated February 14, 2005, Poindexter claimed that he "was given literally only a couple minutes to decide whether or not to accept the offer." Ex. 2.

11

offender. Tr. at 31-34. No doubt Poindexter felt it unnecessary to defend these baseless allegations after learning that the Fourth Circuit had only allowed his petition to survive on the issue of whether he asked Mr. Tuminelli to appeal.

Mr. Tuminelli's testimony at the evidentiary hearing also contradicted Poindexter's allegations in his court filings and his letter of February 14, 2005. Mr. Tuminelli testified that Poindexter was kept abreast of the case developments (including the plea negotiations) throughout the case. Mr. Tuminelli testified that Poindexter definitely knew about the government's proposed plea offer before the day of the rearraignment. Mr. Tuminelli explained that he is certain of his own recollection because he remembers Poindexter expressing concern when Mr. Luna could not be found on the day of the rearraignment that the government might rescind its plea offer. Tr. at 73. As Mr. Tuminelli testified, "the suggestion that he somehow got pressured into this without thinking about it, that is – that's not my recollection, and that's not what happened." Tr. at 76.

Poindexter also claimed in his petition that his attorney, Mr. Tuminelli, "assured [Poindexter] that he would 'most likely' receive the lesser sentence if [Poindexter] promptly accepted the plea offer." Ex. B at 3. Similarly, in his letter to Mr. Tuminelli dated February 14, 2005, Poindexter complained that he was sitting in prison "with a sentence of 14 years as opposed to that of three to six years that [Mr. Tuminelli] practically assured [Poindexter] of." Ex. 2. Yet, at the hearing, Poindexter testified that he understood he could be subject to a 168 month sentence. Tr. at 37. He further testified (under repeated questioning necessitated by his reluctance to answer the questions asked by the government) that he couldn't recall Mr. Tuminelli ever discussing with him whether he was more likely than not going to be sentenced as a career offender and subject to the higher sentence as opposed to the lower sentencing range. Tr. at 42. Mr. Tuminelli by contrast, testified at

12

the hearing, that as the case proceeded to sentencing, he discussed with Poindexter the nature of his prior convictions, in particular, the conviction for assault stemming from the shootout with police officers at Hammerjacks. Tr. at 75. Mr. Tuminelli explained that he also likely had a discussion with Poindexter about the actual time he would serve in jail. See Tr. at 76. Mr. Tuminelli stated that he explained to Poindexter that there was no way they could argue that Poindexter was not a career offender in light of the underlying facts of his prior criminal offenses and the underlying offenses of which he was convicted. See id.

Third, there are discrepancies in Poindexter's own statements about when he asked his attorney to file an appeal. In his letter dated February 14, 2005 to Mr. Tuminelli, Poindexter simply wrote that he and his mother repeatedly asked Mr. Tuminelli to file an appeal. He never provided any specificity about when these requests were made. In his petition, Poindexter alleged that he asked Mr. Tuminelli to appeal on two different occasions – first, in the courtroom right after the sentence was announced and second, a few days later while being held at Supermax. Moreover, neither his February 2005 letter nor his petition mention Ms. Rhyne, nor the details of her alleged communications to Mr. Tuminelli. Then, in his testimony at the evidentiary hearing, Poindexter added a claimed discussion with Mr. Tuminelli while in the U.S. Marshals facility on the Sixth Floor of the U.S. Courthouse.[5] It is also revealing how Poindexter's alleged statements to Ms. Rhyne conflict with his own chronology of when he told Mr. Tuminelli that he wanted to appeal. At the hearing, Poindexter testified that he got Ms. Rhyne involved in his appeal issue when "they were getting ready to shackle me to take me to another facility," [and] I told . . . Sergeant Rhyne that I'm

---

[5] Interestingly, Poindexter also described how he purportedly placed a collect call to Mr. Tuminelli's office from Supermax and said that he wanted to appeal. Tr. at 15.

getting ready to be moved, but I need to file an appeal within my ten days, and *I haven't had a chance yet to contact my attorney*." Tr. at 16. Of course, if this Court were to credit Poindexter's statements in his 2255 petition and/or his court testimony, he must have talked with Mr. Tuminelli on two different occasions by the time he talked to Ms. Rhyne.

Fourth, Poindexter's testimony at the hearing also conflicted with basic facts concerning his background such that this Court must seriously question Poindexter's willingness to offer self-serving lies. In his Court testimony, Poindexter testified under oath that he had never been convicted of distributing narcotics despite the obvious evidence to the contrary. Tr. at 21, cf. Ex. 6 at paras. 44-45. He claimed that although he was charged at one point with distribution and possession of narcotics, he pled solely to the possession charge. Tr. at 21; see also Tr. at 74 (Testimony of A. Tuminelli) ("I knew he had a prior drug felony, which was possession with intent to distribute. There was no question in my mind and I think Mr. Poindexter's mind at the time that that's what the conviction was for"). Similarly, Poindexter lied about his prior conviction for assault with intent to maim, claiming that although he was charged with assault with intent to maim, "it was dropped to a simple assault." Tr. at 20-21. In contrast to Poindexter's testimony, the evidence amply demonstrates that he had been convicted of assault with intent to maim and distribution of controlled dangerous substances and that Poindexter knew this from a number of sources, including Mr. Tuminelli.

The government submits that Poindexter was also not truthful when he claimed at the evidentiary hearing that although he pled guilty so he could be released from jail because he "never, you know, did anything to anybody." Tr. at 61. He made this statement in response to specific questions from the government about his prior criminal record, including his conviction for assault

14

with intent to maim. His answer reveals his unwillingness to acknowledge the truth – even when it is patently obvious and indisputable. It is highly unlikely that Poindexter forgot about the underlying nature of the incidents in question. For example, the conviction for assault with intent to maim involved a Baltimore City Police Department Detective who responded to the Hammerjacks parking lot after hearing shots fired. Upon encountering Poindexter, Poindexter decided to engage in a running gun battle with the officer while trying to flee the area. See Ex. 6.[6] Mr. Tuminelli's testimony at the hearing further calls into question Poindexter's truthfulness – Mr. Tuminelli recalled discussing the underlying facts of the gun battle with the police at Hammerjacks with Poindexter and advising Poindexter that there was "no way that this is not a crime of violence" because it "simply was not a simple assault." Tr. at 75. In addition to the contrast between the facts admitted by Poindexter and the plain record in this case, the government asks the Court to recall Poindexter's entire demeanor when discussing his criminal convictions and how evasive he was in responding to the government's questions about these events.

### 3. The Testimony Of Theresa Rhyne Was Not Credible.

Several aspects of Ms. Rhyne's testimony should cause this Court to question the veracity of the information she conveyed to this Court during the sentencing in this case. Her testimony concerning her conversation with Mr. Tuminelli is not believable and squarely conflicts with Mr. Tuminelli's testimony.

At Poindexter's request, Ms. Rhyne claimed she called Mr. Tuminelli, left a message, and

---

[6] The government also notes that Poindexter's alleged use of a firearm to commit murder on January 21, 2001, which was part of the careful negotiations by the parties in resolving the underlying criminal case, would certainly have been an instance in which Poindexter did something to somebody.

15

eventually spoke with him. She recalled telling Mr. Tuminelli that Poindexter wanted to appeal and Mr. Tuminelli agreeing that he would file an appeal for Poindexter. Tr. at 4-5. As an initial matter, her recollection of this event is extraordinary given the fact that she is responsible for 100 or more prisoners at any given time and has worked at MCAC for 9 years.

Moreover, Ms. Rhyne's alleged conversation was out of character with her duties and responsibilities at MCAC, which she conceded are focused on obtaining clothing, soap, toothpaste, and other necessary essentials for prisoners and rarely involve contacting attorneys. Tr. at 6. She certainly has no official responsibility to intercede on prisoner's behalf. Tr. at 6. In light of the sheer number of prisoners she is responsible for, it would have been understandable if Ms. Rhyne didn't recall Poindexter's name, much less Mr. Tuminelli's name and the details of her supposed conversation with him.

Nevertheless, she claimed to recall the conversation and testified that Mr. Tuminelli didn't seem at all surprised by the request that he file an appeal on behalf of Poindexter. Tr. at 9. The government submits that this is not believable in light of Mr. Tuminelli's statements that if he had ever been asked to appeal at any point throughout this case, he would have been shocked. He also testified that although he has spoke to Ms. Rhyne in the past, he doesn't recall ever receiving a call from her on behalf of Poindexter. See Tr. at 82 ("I don't ever recall a conversation from or a call from Officer Rhyne, and I frankly don't believe that I ever received such a call.").

Moreover, given the overall context of this case – Poindexter pleading guilty under a very favorable plea agreement in the middle of Jonathan Luna's final trial – it is highly unlikely that Mr. Tuminelli asked ***no questions*** upon being asked to appeal. Yet, Ms. Rhyne testified that was exactly how the conversation went. Tr. at 9-10. Furthermore, Ms. Rhyne's testimony in Court was very

16

emphatic that she had a plain recollection of asking Mr. Tuminelli to appeal on behalf of Mr. Poindexter. Yet, moments before her testimony, she admitted that she had been confused in the hallway and told the government that she asked Mr. Tuminelli to file a motion for reconsideration. Tr. 8-9. This incident highlights that Ms. Rhyne's recollection of events cannot be trusted by this Court.[7]

### B. There Are No Other Grounds That Warrant This Court Granting Poindexter's Section 2255 Petition.

To the extent that Poindexter's brief before this Court argues for the first time that his attorney was constitutionally ineffective in failing to consult with him about an appeal, this argument is legally and factually unavailing. Unlike the *per se* rule that the Fourth Circuit has applied to attorneys' failure to file appeals after being asked to do so, see United States v. Poindexter, 492 F.3d 263, 272 (4th Cir. 2007), the Supreme Court and the Fourth Circuit have rejected a bright-line rule with regard to the so-called "duty to consult." Instead, the Supreme Court has instructed that in evaluating whether a duty to consult has been violated, courts should examine whether "there is reason to believe that either (1) a rationale defendant would want to appeal or (2) the defendant reasonably demonstrated to his attorney that he was interested in appealing." Id. at 268. This "duty to consult" standard is different from the situation presented when an attorney ignores the clients request to file an appeal.

In this case, Mr. Tuminelli's testimony at the evidentiary hearing established that he had

---

[7] Furthermore, the government submits that Ms. Rhyne's testimony is legally insufficient to provide a factual basis for a finding of per se ineffective assistance. The government is not aware of any legal precedents requiring attorneys to blindly accept instructions to appeal from surrogates as opposed to the client himself/herself. Indeed, an attorney might commit a grievous error if she/he took such a significant action as the filing of an appeal based merely on hearsay that the client wanted the attorney to appeal.

several discussions with Poindexter concerning the plea and appeal. Tr. at 79, see also Ex. 3 ("My recollection is that you and I discussed an appeal, but . . . you understood that there were no viable appeal issues . . ."). Moreover, even if such discussions had not taken place, Mr. Tuminelli made plain that in his professional judgment any appeal would have been fruitless and could have resulted in the reopening of the murder allegations as well as the larger narcotics conspiracy.[8] Under the applicable legal standards laid down in Flores-Ortega, there was no duty to consult because no rationale defendant in Poindexter's situation would have wanted to appeal and/or manifested the desire to appeal after having a full discussion with his attorney about an appeal. See, e.g., United States v. Edgerton, 2008 WL 2567663, *4 (4th Cir. Jun. 27, 2008). Accordingly, this Court should reject any invitation to find constitutional ineffectiveness on grounds beyond the alleged request to file an appeal.

---

[8] Mr. Tuminelli's judgment as to the fruitlessness of an appeal was well founded – Poindexter had obtained a favorable plea, he had waived his right to appeal, and even if Poindexter had challenged his status as a career offender, it is plain that his prior convictions are qualifying convictions. See U.S.S.G. § 4B1.1; United States v. Byrd, 995 F.2d 536, 537-38 (4th Cir. 1993); United States v. Harp, 406 F.3d 242 (2005).

## **CONCLUSION**

The government respectfully requests that this Court DENY petitioner's claim for relief pursuant to 28 U.S.C. § 2255.

Respectfully Submitted,

Date: September 17, 2008

Rod J. Rosenstein
United States Attorney

By:_____/s/_____
Harry M. Gruber
Assistant United States Attorney
36 S. Charles St., Suite 400
Baltimore, Maryland 21201
(410) 209-4800

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of September 2008, a copy of the Government's Post-Hearing Brief was electronically served on the following individual who receives electronic notice through CM/ECF as listed on the CM/ECF Notice of Electronic Filing, as well as by first class mail:

Michael Lawlor, Esq.
6305 Ivy Lane, Suite 704
Greenbelt, MD 20770

_____/s/_____
Harry M. Gruber
Assistant United States Attorney